FIFTH DIVISION
May 14, 2010

No. 1-07-3386

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 05 CR 12718 |
| | ) | |
| LINDA SHELTON, | ) | The Honorable |
| | ) | Joseph Kazmierski, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the opinion of the court:

To paraphrase Tolstoy, happy litigants are all alike, but every unhappy litigant is unhappy in her own way. Most litigants express displeasure with the legal process in exceedingly civil ways. They might complain in private to their lawyer, vent with their family, or take it out on some unsuspecting store clerk. Some flash occasional signs of anger that might seem unsettling. A few allow their temperament to become deranged enough to cause disturbances during court proceedings and wind up in our correctional institutions. In this appeal, we consider the rather strident and entirely misplaced arguments of a habitually contumacious physician whose obstreperous conduct while on trial for Medicaid vendor fraud justly earned her some Cook County jail time for direct criminal contempt. The events that led to her confinement and the tragicomic happenings while in jail will be punctiliously elucidated below; but in a nutshell, she chose to use some of her jail time to physically confront a supervisor in the facility, which led to an indictment for aggravated battery, for which she received a two-year sentence in the Department of Corrections. She raises 18 meritless arguments in this *pro se* appeal from that

conviction.  We affirm.

## BACKGROUND

### *Litigation Background*

Defendant, Linda Shelton, M.D., was charged in 2004 with Medicaid vendor fraud. Although she was ultimately exonerated by a jury of that charge in February of 2009, defendant proved to be a very disruptive presence during pretrial proceedings.  The contretemps seem to have been generated by her proclamation that she wanted to represent herself.  The trial judge granted this request, which was ineluctably followed by a request for a standby attorney that the judge denied on the basis that the case did not appear to be unduly complex.  After a number of court appearances, defendant's ardor for self-representation seemed to wane, particularly after she served three weeks in custody for failing to appear at a court hearing.  At one point, private counsel appeared for defendant and handled the case without incident for several months. Inevitably, defendant began to have conflicts with her attorney, which played out in a number of court appearances.  She was at turns complimentary to her counsel, saying he was "the best there is," and then bizarrely dismissive, claiming he was "too concerned about being nice to judges and prosecutors."

Taking another turn on the representation front, defendant informed her counsel that she wanted to represent herself, triggering his motion to withdraw.  This attorney informed the court that he believed defendant would be making a big "mistake" if she represented herself.  This led defendant to request that her lawyer appear only as standby counsel.  During a hearing on her attorney's request to withdraw, defendant began a lengthy diatribe that sought to establish her

*bona fides* in the *pro se* area, including a claim that she had won more than a dozen cases with standby counsel. She peppered her remarks with attacks against various elected officials, including a Cook County commissioner, the Attorney General, and the Governor of the State of Illinois. Months later, two other private attorneys filed appearances on defendant's behalf, which only prompted defendant to reiterate at the next hearing that she wanted to represent herself.

It is against this checkered background of back-and-forth representation issues in the Medicaid fraud case that the events leading to the finding of direct criminal contempt occurred. At a particularly contentious hearing in the fraud case, defendant verbally accosted the trial judge, who gave all appearances of attempting to control his courtroom in the face of a wildly inappropriate litigant who repeatedly accused him and his judicial colleagues of running a criminal enterprise. Ultimately, defendant's words and actions proved to be too much for the rather tolerant judge, who found defendant in contempt and sentenced her to 30 days in the Cook County jail.

Regrettably, defendant did not seem to accept the message that the contempt citation was designed to give. While in jail, she continued to be an irritant to all personnel, ultimately leading to a physical confrontation with a supervisor in the jail in which she struck the man. Curiously enough, the instrument that she chose for the alleged battery was a wheelchair that she claimed to need as a result of weakness brought on by a hunger strike and an underlying medical condition.

*The Jailhouse Battery Case*

Defendant was charged with two counts of aggravated battery pursuant to section 12–4(B)(6) of the Criminal Code of 1961 (720 ILCS 5/12–4(B)(6) (West 2004)). At the grand

jury hearing, the State presented one witness, Investigator Sofus of the Cook County sheriff's police gang crime narcotics unit, jail enforcement team. Investigator Sofus testified that she investigated an aggravated battery to a correctional police officer that occurred on May 16, 2005. At that time, defendant was an inmate of the Cook County department of corrections. Sergeant Salemi, the alleged victim, was an officer with the Cook County sheriff's department assigned to the department of corrections. Sergeant Salemi was on duty and in uniform. Sergeant Salemi was called to defendant's cell because defendant was flooding her toilet. When Sergeant Salemi neared her cell, defendant, sitting in a wheelchair, threatened to leave if he opened the door. Sergeant Salemi opened the door, defendant rammed her wheelchair into him, striking his shins. While Sergeant Salemi attempted to control defendant, she kicked him in the chest. The grand jury returned an indictment charging defendant with two counts of aggravated battery.

At trial, the State called two witnesses: Sergeant Salemi and nurse Ogali. Sergeant Salemi testified that he knew defendant prior to May 16, 2005, because of her long history of incidents with security and medical staff. On May 16, 2005, he was notified by Officer Hall that defendant was yelling and flooding her cell. Sergeant Salemi and Officer Hall approached defendant's cell, looked through a window on the cell door, and observed defendant yelling while sitting on a wheelchair in the middle of the room. Officer Hall unsecured the door, which opened outward, then returned to her desk per Sergeant Salemi's instructions.

Sergeant Salemi stepped "not even six inches" into the room with his back to the door. Defendant rolled toward Sergeant Salemi and rammed the wheelchair foot pegs into his shins. Sergeant Salemi pushed her back. Defendant leaned back in the chair and kicked him in the

chest. Sergeant Salemi went backwards and defendant fell to her side onto the floor because there were no arms on the wheelchair. Sergeant Salemi handcuffed her and took the wheelchair out of the room. Sergeant Salemi noticed his legs were bleeding, so he went to the emergency room to receive treatment. Through Sergeant Salemi's testimony, the State introduced photographs of defendant's cell and photographs of the cuts and scrapes on his legs.

On cross-examination, Sergeant Salemi testified that he had been in contact with defendant earlier that day. He was made aware that defendant had asked for a pen, according to Officer Hall's notes, but did not independently remember defendant yelling about a pen and paper. Sergeant Salemi stated that if the wheelchair had been broken, it would not have been in use. There was no evidence of any injury to his chest.

The State next called nurse Ogali, a registered nurse at the Cook County jail. Nurse Ogali testified that on May 16, 2005, at approximately 4 p.m., she noticed that the hallway was flooding from defendant's cell, and defendant was banging on the cell door. She observed Sergeant Salemi from her nursing station as he and a female guard opened defendant's door. After the door was opened, she observed defendant move forward. Sergeant Salemi bent down to take the wheelchair, and defendant fell down. She was aware that defendant was flooding her cell, banging on the door, cussing, and screaming. When she ran in to assist defendant, defendant was screaming, "I need to call my lawyer. I'm suing! I need to call my lawyer! I'm suing!" Defendant told nurse Ogali to leave her alone. Nurse Ogali then observed the bleeding from Sergeant Salemi's legs.

The defense called eight witnesses during its case-in-chief. Dr. Vern was a neurologist

who first came into contact with defendant on May 31, 2005, when she was admitted to the hospital for psychiatric evaluation and for certain neurological complaints. Dr. Vern testified that defendant suffered from a permanent disability as a result of spinal stenosis. He opined that it was not physically feasible for defendant to have leaned back in the wheelchair and kick Sergeant Salemi because she could not raise both legs to the level of one's chest and kick out.

The defense next called Dr. Briller, a cardiologist who began treating defendant on July 1, 2005. She treated defendant for a variety of heart problems, including frequent fainting spells, arrhythmia, and a history of valve problems. Dr. Briller stated that both dehydration and hunger would affect one's energy and strength. With prolonged deprivation of food, a person would become weak and dizzy.

The defense also called Sensei Gregory Johnson, a licensed private detective. Johnson was formerly a Chicago policeman and a Cook County State's Attorney investigator, but the trial court denied the defense's request to tender Johnson as an expert in police and guard procedures. Johnson testified that male guards were not permitted to be alone with female inmates. On cross-examination, Johnson testified that he never worked as a correctional officer and that his opinion was based on procedures in place in 1982. He was unaware if current procedures were the same as in 1982.

Defendant also testified, offering a lengthy recitation of facts that allegedly led up to the altercation with Sergeant Salemi. Making a long story short, defendant testified that she did not accelerate her wheelchair into Sergeant Salemi and denied kicking him in the chest.

The long version: defendant testified that she was incarcerated on May 10, 2005, for

contempt of court, and she proceeded to make a number of complaints to staff, including such accusations as not being provided with sufficient pens and paper. Defendant explained that she complained repetitively, went on a hunger strike, banged on the door, and asked for supervisors because she was not allowed to make a phone call, was not given her medication and extra salt, and was deteriorating rapidly. In response to her complaints, she claimed the guards injected her involuntarily with sedatives. By May 16, 2005, she was confined to a wheelchair because she was so weak from these experiences. On the date in question, defendant said she was banging on the door, asking for supervisors. She affirmatively explained that she wanted to be more of a nuisance, so she put some water in a cup and threw the water under the door. She claimed to have only done this "a couple of times." About one hour elapsed from when she threw water under the door until Sergeant Salemi arrived.

According to defendant, she was pounding on the door when Sergeant Salemi first arrived. Sergeant Salemi opened the door about two to three feet. He pulled the door opened with his left hand and lunged at defendant with his right hand. His right hand landed on her throat, and the force pushed the wheelchair backwards. When he lunged at her, his legs hit the foot rest of the wheelchair. The wheelchair moved and he struggled to regain his balance. He grabbed her left arm and ripped the wheelchair out from under her, causing her to fall. As a result of the altercation, defendant claimed contusions on the back of her knees and arms, abrasions on her thighs, and an injury to her third toe. Defendant said she was terrorized, stunned, and disoriented.

At the close of trial, the jury found defendant guilty of aggravated battery. The trial court

7

sentenced her to two years' imprisonment in the department of corrections. Defendant filed a timely notice of appeal on December 10, 2007. Though she was temporarily represented by the state appellate defender, defendant has primarily represented herself *pro se* on appeal. Since December 2007, she has filed 37 motions in the appellate court. She submitted an 82 page brief– raising 18 issues on appeal, the overwhelming majority of which are entirely baseless– and a 40 page reply brief. For the reasons that follow, we affirm the judgment of the circuit court.

ANALYSIS

*Grand Jury Hearing and Indictment*

Defendant first contends that her due process rights were violated in that the State obtained the indictment through fraud and deception. Defendant alleges the State's witness, Investigator Sofus, provided false testimony, relied on false hearsay statements, and withheld exculpatory evidence that proved it was impossible for defendant to commit the crime.

The grand jury determines whether probable cause exists that an individual has committed a crime, thus warranting a trial. 725 ILCS 5/112–4 (West 2004); *People v. DiVincenzo*, 183 Ill. 2d 239, 254 (1998). An accused may not challenge an indictment on the ground that it is not supported by sufficient evidence where there is any evidence to support the indictment. *People v. Fassler*, 153 Ill. 2d 49, 59 (1992). Hearsay testimony does not affect the validity of the indictment returned against defendant. *People v. Pulgar*, 323 Ill. App. 3d 1001, 1010 (2001); *Fassler,* 153 Ill. 2d at 60. The State is not obligated to present exculpatory information to a grand jury. *Pulgar*, 323 Ill. App. 3d at 1010. The State is not obligated to inform the grand jury that certain testimony constituted hearsay. *Pulgar*, 323 Ill. App. 3d at

1010. A witness's testimony constitutes perjury only if the witness knowingly makes a false statement. *Pulgar*, 323 Ill. App. 3d at 1008. The burden is on the defendant to show that the State prevented the grand jury from returning a meaningful indictment by knowingly presenting perjured testimony. *Pulgar*, 323 Ill. App. 3d at 1010. The record indicates that defendant failed to meet this burden.

Defendant next contends that the indictment was insufficient and void because it did not state a specific, overt act constituting an aggravated battery, did not indicate the weapon used to commit a battery, and did not otherwise specify how and where she made contact with Sergeant Salemi. Defendant contends that this information was an integral part of the offense and determinative of whether the conduct was insulting or provoking.

To preserve an issue for appellate review, a defendant must both object at trial and present the same issue in a written posttrial motion. *People v. Harris*, 394 Ill. App. 3d 28, 37 (2009). Defendant did not object to the sufficiency of the indictment at trial or in a written posttrial motion. Accordingly, defendant has forfeited her challenge to the sufficiency of the indictment on appeal. This court will review unpreserved error when a clear and obvious error occurs and: (1) the evidence is closely balanced; or (2) that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008). In addressing defendant's plain error contention, we must first determine whether there was any error at all. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). We find that the indictment was sufficient and no clear and obvious error occurred.

Because the indictment was not challenged on these grounds in the trial court, our review

is limited to deciding whether the " 'indictment apprised defendant of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to future prosecution arising out of the same conduct.' " *People v. Winford*, 383 Ill. App. 3d 1, 4 (2008), quoting *People v. Edmonds*, 325 Ill. App. 3d 439, 443 (2001). An indictment must state the name of the offense, cite the statutory provision alleged to have been violated, set forth the nature and elements of the offense charged, state the date and county of the offense, and state the name of the accused, if known. 725 ILCS 5/111–3(a) (West 2004).

Here, the indictment charged defendant with aggravated battery committed on May 16, 2005 in Cook County in violation of section 12–4(b). The State set forth the nature of the offense by alleging that defendant knew Sergeant Salemi was a peace officer and struck him about the body. This indictment is sufficient to bar future prosecution of the same offense as the record leaves no doubt that defendant was prosecuted for aggravated battery on the date and time specified in the indictment. See *People v. Winford*, 383 Ill. App. 3d 1, 6 (2008).

### *Self-representation*

Defendant next contends that she was denied her sixth amendment rights when she was not allowed to represent herself, to present her own theory of the case, and to have standby counsel. Defendant has forfeited this issue as she did not raise it in a posttrial motion. Under the plain error doctrine, we will review unpreserved error when a clear and obvious error occurred. As the analysis below will reveal, we find no such error occurred here.

A criminal defendant has a constitutional right to represent herself if she makes an unequivocal request to do so. *People v. Rohlfs*, 368 Ill. App. 3d 540, 544 (2006). The trial

court's decision on a defendant's election to represent herself will be reversed only if the court abused its discretion. *Rohlfs*, 368 Ill. App. 3d at 545. Here, defendant did not unequivocally request to represent herself. Her efforts in this regard were rather episodic and chaotic. Defendant proceeded *pro se* from June 15, 2005, to February 7, 2006. Beginning on February 7, 2006, and throughout the remainder of this litigation in the trial court, five private attorneys appeared on defendant's behalf: Frederick Cohn, Joseph DiNatale, Sheldon Sorosky, Nicholas Albukerk, and Rob Deters. Despite defendant's stated dissatisfaction with her defense attorneys, her behavior does not demonstrate that she unequivocally invoked her right to self-representation. At the least, the record indicates that on May 24, 2007, defendant positively expressed her desire to have Albukerk represent her at trial. Albukerk did represent her through trial and agreed to act as standby counsel during posttrial motions. It is apparent from defendant's vacillating positions between five attorneys that her request for self-representation was not an unequivocal invocation of her right to proceed *pro se.* Under these circumstances, the trial court did not abuse its discretion in denying defendant's request.

Additionally, the trial court has broad discretion to appoint counsel for advisory or other limited purposes. *People v. Redd*, 173 Ill. 2d 1, 38 (1996). We find that the trial court did not abuse its discretion in refusing to appoint standby counsel when it found that defendant had not cooperated with standby counsel in the past and that defendant had privately retained counsel. Moreover, the trial court permitted defendant to make standby arrangements with any of her attorneys.

*Expert Witnesses*

1-07-3386

Defendant next contends that the trial court denied her a fair trial by denying her motion to pay for expert witnesses. Defendant has forfeited this issue because she did not raise it in a posttrial motion. Under the plain error doctrine, we will review unpreserved error when a clear and obvious error occurred. For the following reasons, we find no such error occurred here.

A denial of funds to an indigent for the securing of expert witnesses in defense of criminal charges may violate constitutional protections in certain circumstances. *People v. Lawson*, 163 Ill. 2d 187, 220 (1994). Our supreme court explained that the touchstone in determining whether an indigent defendant is entitled to funds to secure an expert "is not with what is useful, helpful, valuable, or even important to the defense effort but what is 'crucial' to it." *People v. Keene*, 169 Ill. 2d 1, 7 (1995) quoting *People v. Glover*, 49 Ill. 2d 78, 82-83 (1971).

Initially, we note that it is unclear where, if anywhere, in the record defendant was proclaimed indigent by the trial court. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Assuming *arguendo* defendant was indigent, we find the trial court did not err in refusing her request to secure an engineering expert witness. Defendant sought an engineering expert to testify that she was physically incapable of moving the wheelchair by herself at the speed necessary to have committed the alleged crime. Given the evidence she presented at trial, this expert testimony was not crucial to her defense of physical impossibility, especially since defendant offered medical testimony that was roughly equivalent. The alleged battery also clearly was not the sort of incident that required an engineering explanation in order for the jury to understand the issue.

12

Defendant next contends that the trial court erred in not accepting Sensei Gregory Johnson as an expert witness in the field of police and guard procedures. Defendant did not contemporaneously object to this ruling at trial, so the issue has been forfeited. We will again apply the plain error doctrine and only review unpreserved error when a clear and obvious error occurred. As the following discussion will reveal, we find no such error occurred here.

The decision to qualify a witness as an expert rests within the sound discretion of the trial court. *People v. Lovejoy*, 235 Ill. 2d 97, 125 (2009). We will find an abuse of discretion only where the trial court's decision is "arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court." *Lovejoy*, 235 Ill. 2d at 125. "A person can be permitted to testify as an expert if that person's experience and qualifications afford him or her knowledge that is not common to the average layperson and will assist the jury in evaluating the evidence and reaching a conclusion." *Lovejoy*, 235 Ill. 2d at 125.

We conclude that the trial court did not abuse its discretion in rejecting Johnson as an expert in the field of police and guard procedures. In essence, Johnson based his opinion that male guards are never to be alone with female inmates on procedures that were in place in 1982, when he had last investigated an incident with the State's Attorney's office. He testified that he did not know if the procedures had changed since then. Johnson never worked as a correctional officer, never attended the Cook County correctional officer training program, and did not read the correctional officer training manual. On review, Johnson was properly found to be unqualified to testify as an expert in this case on these issues.

*Outrageous Government Conduct*

Defendant next contends that the trial court denied her the right to a fair trial by not permitting her to introduce evidence of outrageous government conduct. Defendant asserts that in retaliation for her "whistle blower and activist activities," the Cook County sheriff's office and the State's Attorney's office engaged in a series of false arrests, perjured testimonies, malicious prosecutions, and wrongful convictions prior to the initiation of this suit. Defendant further asserts that this pattern of outrageous conduct supports her proposition that Sergeant Salemi attacked her and contradicts the State's theory that she attacked him. Defendant also accuses the government of illegally drugging her while incarcerated, charging her with a crime she physically could not commit, negligently investigating the incident, tampering with evidence, and withholding exculpatory evidence. Like most of the claimed errors on appeal, as the reader has seen from the foregoing analysis, defendant also forfeited this issue when she did not raise it in a posttrial motion. This will again send us to the plain error doctrine, in which we will review unpreserved error if a clear and obvious error occurred. Again, no such error occurred here.

While the defense of outrageous conduct does indeed exist, defendant failed to establish any reasoned argument that it could amount to a defense in this sort of a battery case. "Whether the circumstances of a case demonstrate outrageous government conduct is a question of law for the court to decide." *People v. Ming*, 316 Ill. App. 3d 1274, 1281 (2000). "A defendant can raise the defense of outrageous conduct if the government was overly involved in the creation of a crime or if the government coerced the defendant into participating." *Ming*, 316 Ill. App. 3d at 1281. "Whether or not conduct is outrageous must be determined on an *ad hoc* basis and cannot be reduced to a specific formula." *Ming*, 316 Ill. App. 3d at 1281. To prove a due process

14

violation, the level of outrageousness of the government's behavior must shock the conscience of the court. *People v. Hirsch*, 221 Ill. App. 3d 772, 779 (1991).

We find that the trial court did not abuse its discretion in denying defendant's defense and evidence of outrageous government conduct. In denying the defense, the trial court stated, "I have looked at this motion and determined a lot of other things that may not have anything to do with this case in particular." The trial court examined the motion and expressed its belief that the evidence of outrageous government conduct was not appropriate for this battery case. The government's behavior does not shock the conscience of this court, either. Defendant admitted that she was being annoying to get the attention of the guards. When Sergeant Salemi responded, an altercation ensued. Being a purposeful irritant hardly gives a prisoner a license to engage in outrages like battery of jail officials. The trial court did not abuse its discretion in limiting the evidence presented at trial to this altercation.

*Guilty Beyond a Reasonable Doubt*

Defendant next contends that the State failed to prove her guilty beyond a reasonable doubt. When presented with a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979).

To sustain a conviction for aggravated battery, the State was required to prove the following elements: (1) defendant intentionally or knowingly caused bodily harm or made

physical contact of an insulting or provoking nature with an individual; (2) defendant knew the individual harmed to be a peace officer; and (3) such officer was engaged in the execution of any official duties. 720 ILCS 5/12–4(b)(6) (West 2004).

The State presented sufficient evidence upon which the jury could conclude that defendant committing an aggravated battery. According to Sergeant Salemi's testimony, he had known defendant prior to this incident. He was in his uniform. When he entered defendant's cell, she rolled toward him, bounced, and rammed the foot pegs of her wheelchair into his shins. As he pushed her back, she leaned back in the chair and kicked him in the chest. Sergeant Salemi went backwards and defendant fell to her side onto the floor. When Sergeant Salemi stepped out of the cell, he noticed his legs were bleeding. Nurse Ogali corroborated Sergeant Salemi's testimony. She testified that when Sergeant Salemi and Officer Hall opened defendant's cell door, she saw defendant move forward. She observed Sergeant Salemi bend down and grab the wheelchair, causing defendant to fall down. Sergeant Salemi showed her the bleeding in his front legs. We find this evidence sufficient to prove defendant guilty beyond a reasonable doubt of aggravated battery.

Defendant's claim that the State did not present "one shred of credible evidence" is hardly worth a single word of legal analysis, but we will supply some for the edification of the defendant and any other readers of this opinion. Among other alleged inconsistencies, defendant argues that Sergeant Salemi's testimony was incredible in that he falsely testified about the cell door, and his version of events was incompatible with the injuries he sustained.

Defendant essentially attacks on the credibility of the State's witnesses and the weight to

16

be given to their testimony in comparison to the weight to be given to her witnesses. Defendant asserts that her witnesses contradicted any inculpatory evidence presented by the State. Any inconsistencies in the evidence and issues of credibility were properly before the jury. We will not reweigh the evidence or retry defendant. We conclude that in viewing the facts in the light most favorable to the State, a rational jury could have found defendant guilty of aggravated battery beyond a reasonable doubt.

*Preserving the Evidence*

Defendant next contends that the trial court erred in refusing to enforce its order for the State to produce critical evidence in discovery– namely, the wheelchair– which deprived defendant the opportunity to have an expert examine it. Defendant similarly contends that the State failed to produce paramedic reports for multiple instances during the week of the alleged crime that would have shown defendant was too weak to have committed the alleged acts.

"[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58, 102 L. Ed. 2d 281, 289, 109 S. Ct. 333, 337 (1988).

The record indicates that the State searched for the wheelchair and for the paramedic reports while repeatedly informing the trial court that those items could not be located. From June 15, 2005, through October 4, 2005, the State attempted to but failed to locate the wheelchair. On October 4, 2005, the State informed the trial court for the third time that it had not been able to find the wheelchair. The State explained, "the wheelchairs don't have any kind of numbers on them. And they can be used by anybody in the Cook County Jail. At any given

17

time they can be in any of the divisions." Given the difficulty in finding an unmarked wheelchair, possibly located anywhere in the department of corrections, defendant failed to establish the State acted in bad faith.

Similarly, the State attempted to acquire the paramedic reports from February 7, 2006, to March 16, 2007, but was unable to do so. On February 8, 2007, the State informed the trial court, "I've subpoenaed [the paramedic reports] at least half a dozen times and [they] don't exist as far as I know." On March 16, 2007, the State again represented that it had continuously attempted to obtain the paramedics records but was unable to do so. Defendant represented she did have some of the paramedic reports, including the one from the date of the alleged incident, but not the reports from other incidents occurring throughout the week prior to and after the incident. As with the wheelchair, defendant has failed to establish that the State acted in bad faith in failing to locate the paramedic reports.

Accordingly, defendant was not deprived her due process rights because the State searched for the wheelchair and for the paramedic reports, and the State did not act in bad faith when it failed to produce them.

*Motion in Limine*

Defendant next contends that the trial court erred in permitting the State to question her on cross-examination about her suspended medical license in violation of a ruling *in limine*. Defendant contends that this question prejudiced the jury by introducing bias that she was a bad doctor.

The trial court previously granted a motion *in limine* barring introduction of the fact that

defendant filed a disability lawsuit five weeks prior to this incident as it "[did] not have any relevance in this case." Defendant argues that this ruling *in limine* would somehow bar evidence regarding her suspended license because that suspension was the result of a then-pending lawsuit. On cross-examination, the State asked, "[I]sn't it true that your license to practice medicine has been suspended indefinitely?" Defense counsel objected; the trial court sustained the objection and instructed the jury to disregard any answers. In the spirit of volunteerism, defendant then stated that she wanted to respond to the question even though her attorney objected. When asked if she was currently practicing medicine, defendant responded, "I didn't renew [my license] in 2005, and the state of Illinois, because I'm a federal witness against corrupt officials in the Department of Professional Regulation, is attempting to suspend my license in retaliation for my activist work."

First, any error that may have resulted from this dialogue would have been properly corrected by the trial court in sustaining the objections and instructing the jury to disregard. See *People v. Young*, 347 Ill. App. 3d 909, 925 (2004). Second, to state the obvious, the defendant voluntarily answered the question when she perhaps should have remained mute. Simply put, a defendant may not request the trial court to proceed in one manner and subsequently challenge the court's action as error on appeal. *People v. Harvey*, 211 Ill. 2d 368, 385 (2004).

*Opening Statement and Closing Argument*

Defendant next contends that the State made "denigrating and defaming" comments, which biased and misled the jury in both its opening statement and closing arguments. In her reply brief, defendant analogizes the effect of these comments on her trial to a "Salem-like witch

trial." When confronted with the legal question of whether a prosecutor's comments warrant the grant of a new trial, our review is *de novo*. *People v. Ramos*, 396 Ill. App. 3d 869, 874 (2009).

Defendant did not object to any comments made during the State's opening statement, so this argument has been forfeited. Under the plain error doctrine, we will review unpreserved error when a clear and obvious error occurred.

We find that no error occurred in the State's opening statement. The allegedly improper comments reflect nothing more than defendant's hypertechnical disagreement with the State's evidence. For example, defendant argues that the State's comment that she threw toilet water under her cell door was improper because her evidence showed that the water actually came from the sink. It is nigh impossible to divine the importance of such a distinction. The remaining arguments about the opening statement are similarly vacuous and not worthy of discussion.

Next, defendant contends that the State acted improperly during closing argument. Prosecutors are accorded wide latitude in the content of their closing arguments. *People v. Runge*, 234 Ill. 2d 68, 142 (2009). Only those comments that cause substantial prejudice to the defendant will result in a reversal. *Ramos*, 396 Ill. App. 3d at 874. The complained-of statements in this case fall short of that standard.

After considering the State's closing argument as a whole, we find that the assistant State's Attorneys acted within their wide latitude and did not cause substantial prejudice to defendant. We do not agree with defendant that the State "wrongfully assassinated" her character or "wrongfully denigrated" her expert witnesses. One such complaint occurred when the State commented that defendant did not have "a constitutional right to a pen." This hardly sounds like

character assassination, but defense counsel promptly objected, and the trial court sustained the objection. Accordingly, the State's closing arguments did not cause any prejudice to defendant and do not warrant reversal.

Defendant next contends that the State "tampered with the evidence" by introducing photographs of defendant's cell door lacking its hydraulic closing mechanism. It is within the discretion of the trial court whether to admit a photograph into evidence based on its consideration of the photograph's probative value as opposed to its prejudicial effect and a determination whether it portrays facts relevant to an issue and can be verified as a correct representation of those facts. *People v. Jones*, 114 Ill. App. 3d 576, 590 (1983). Its decision will not be reversed absent a showing of an abuse of that discretion and resulting prejudice to the defendant. *Jones*, 114 Ill. App. 3d at 590.

Here, the trial court did not abuse its discretion in admitting the photographs. The jury was not misled or prejudiced by the introduction of the photographs into evidence where defense counsel cross-examined Sergeant Salemi and adduced that there was typically a contraption on the top of every door.

*Jury Selection*

Defendant next contends that, during *voir dire*, a potential juror expressed that he would give more weight to the testimony of a police officer and that it was possible that this potential juror was ultimately chosen to be a juror. Defendant did not object during *voir dire* and, remaining utterly consistent, did not include this argument in a written posttrial motion, so this argument has been forfeited and is also wholly unsupported by our examination of the record.

*Nonpattern Jury Instructions*

Defendant next contends that the trial court erred in refusing her non-Illinois Pattern Jury Instructions (IPI) regarding the State's failure to produce the wheelchair. At the jury instruction conference, defendant tendered the following non-IPI instruction, "If you find that the State has allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest." The trial court properly refused the instruction.

The decision to instruct a jury using nonpattern instructions is reviewed for an abuse of discretion. *People v. Pollock*, 202 Ill. 2d 189, 211 (2002). Whether a court has abused its discretion will depend on whether the nonpattern instruction tendered is an accurate, simple, brief, impartial, and nonargumentative statement of the law. *Pollock*, 202 Ill. 2d at 211.

In this case, the trial court did not abuse its discretion in refusing defendant's nonpattern instruction. There was sufficient evidence presented on both sides of the case as to the operating condition of the actual wheelchair. The trial court permitted defendant to comment on the whereabouts of the wheelchair. There was no evidence presented that the State lost or destroyed the wheelchair. At the most, defendant could establish that the State could not find the wheelchair. Accordingly, the trial court did not abuse its discretion in refusing the nonpattern instruction.

*Cross-examination*

Defendant next contends that the State improperly cross-examined her. A trial court has discretion to allow the prosecution wide latitude during cross-examination of the defense witnesses. *People v. McCarthy*, 213 Ill. App. 3d 873, 883 (1991). The proper scope of cross-

examination extends to matters raised on direct examination, including all matters which explain, qualify, or destroy the testimony on direct examination. *McCarthy*, 213 Ill. App. 3d at 883. Only where the court has abused its discretion, resulting in manifest prejudice to the defendant, will a reviewing court interfere. *McCarthy*, 213 Ill. App. 3d at 883-84.

The trial court did not abuse its discretion during the State's cross-examination of defendant. Defendant complains the State introduced "unverified hearsay," "false hearsay claims," and "falsified records." We find no such evidence in the record. The State questioned defendant within the permissible bounds throughout the examination. Because defendant did not support her complaints with any basis in law, and rather relies on vague, speculative assertions sounding in hearsay, we choose not to address her complaints further.

*Sentencing*

Defendant next contends that the trial court erred in sentencing her to incarceration instead of probation. On March 30, 2008, defendant completed serving her term of imprisonment and was released from the Department of Corrections to a term of mandatory supervised release (MSR). On March 27, 2009, defendant completed the MSR term. Both parties agree that defendant's sentence was completed in March 2009. The State contends that any sentencing issues on appeal are moot. Defendant invites this court to apply the public interest exception to the mootness doctrine to vacate her sentence and change it to probation.

"When the issues involved in the trial court no longer exist due to intervening events that have rendered it impossible for the appellate court to grant effectual relief to defendant, the case is moot." *People v. McNulty*, 383 Ill. App. 3d 553, 558 (2008). A sentencing challenge is moot

23

where defendant has completed serving his sentence. *People v. McNulty*, 383 Ill. App. 3d 553, 558 (2008). Here, it is impossible to sentence defendant to probation in lieu of imprisonment where she has already completed her term of incarceration. Accordingly, this issue is moot since we cannot grant defendant any effectual relief. We decline defendant's invitation to apply the public interest exception to vacate her sentence.

### *Trial Court Bias*

Defendant next contends that the trial court "had a pervasive atmosphere of bias and hostility" toward her, which denied her a fair trial. Defendant has the burden of establishing a judge's bias or prejudice. *People v. Tatum*, 389 Ill. App. 3d 656, 668 (2009). A judge's bias or prejudice is shown where there is active personal animosity, hostility, ill will, or distrust towards the defendant. *People v. Hooper*, 133 Ill. 2d 469, 513 (1989).

Defendant complains of various instances where the trial court did not grant her requests. For example, when defendant complained that the State was not responding to her discovery requests, the trial court stated, "Well you may ask for certain things but whether or not you are entitled to them and will receive them that's another point. Certainly [the assistant State's Attorneys] have to comply with Supreme Court rules of disclosure to the accused." We disagree with defendant that this statement expressed bias. Rather, the trial court appropriately responded to defendant's discovery request and reminded the State to comply with the rules of discovery. We find no bias or prejudice in this, or any other, statement or action taken by the trial court throughout this litigation. Accordingly, defendant has not met her burden of establishing any animosity, hostility, ill will or distrust on behalf of the trial court.

24

*Ineffective Assistance of Counsel*

Defendant next contends that she received ineffective assistance of counsel in that defense counsel failed to question defendant about details of how the wheelchair was broken, to call numerous exculpatory witnesses, and to use the arrest report and Investigator Sofus' report to impeach Sergeant Salemi. To determine whether a defendant received ineffective assistance of counsel, we apply the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). To prevail, defendant must show both that: (1) counsel's representation was so deficient as to fall below an objective standard of reasonableness, and (2) the deficient performance so prejudiced defendant as to deny him a fair trial. *People v. Perry*, 224 Ill. 2d 312, 341 (2007). If either prong of the *Strickland* test is not met, defendant's claim must fail. *Perry*, 224 Ill. 2d at 342.

Under the first prong, there is a strong presumption that trial counsel's action or inaction resulted from sound trial strategy. *Perry*, 224 Ill. 2d at 341-42. To overcome this strong presumption, defendant must demonstrate trial counsel's decision was so unreasonable and irrational that no reasonably effective defense attorney faced with similar circumstances would pursue that strategy. *People v. King*, 316 Ill. App. 3d 901, 916 (2000).

Defendant essentially argues that defense counsel was ineffective because he failed to call a number of witnesses and to introduce copious evidence to further advance her theory that she was physically incapable of committing the alleged crime. We disagree. Defense counsel called both expert witnesses and fact witnesses to testify that defendant was physically unable to commit the alleged crime. Defense counsel also called character witnesses to testify to

defendant's non-violent reputation in the community. Defendant herself testified that she was physically unable to commit the alleged crime. Indeed, the record reveals that defense counsel did a commendable job of defending an extremely demanding and combative client. We find nothing unreasonable or irrational with any trial strategy, even if it the jury found his client guilty. *People v. Palmer*, 162 Ill. 2d 465, 482 (1994). In view of our disposition of the first prong of the *Strickland* analysis, we need not address whether defendant suffered prejudice as a result of defense counsel's alleged deficiencies. *People v. Rodriguez*, 312 Ill. App. 3d 920, 926 (2000). Accordingly, defendant did not receive ineffective assistance of counsel.

## CONCLUSION

Defendant seems to have mastered a wide-ranging system of wreaking havoc within our judicial system, and in this instance, she should have conclusively learned that the system is flexible but firm. Her method of expressing her displeasure with the trial court's finding of contempt reflects a deep-seated and particularly malevolent mistrust of the judicial process. This is ironic, given that defendant seems to spend an inordinate amount of time in court. Despite defendant's easily expressed contempt for all aspects of jurisprudence, it is our considered opinion that she was appropriately charged, evenly tried, and fairly sentenced for her illegal conduct while confined in jail.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

FITZGERALD SMITH and HOWSE, JJ., concur.

1-07-3386

| Please Use Following Form: | |
| --- | --- |
| Complete TITLE of Case | THE PEOPLE OF THE STATE OF ILLINOIS,<br><br>Plaintiff-Appellee,<br><br>v.<br><br>LINDA SHELTON,<br><br>Defendant-Appellant. |
| Docket No.<br><br>COURT<br><br><br>Opinion Filed | No. 1-07-3386<br>Appellate Court of Illinois<br>First District, FIFTH Division<br><br>May 14, 2010<br>(Give month, day and year) |
| JUSTICES | JUSTICE LAVIN delivered the opinion of the court:<br><br>Fitzgerald Smith and Howse, JJ.,   concur<br>dissent[s]<br><br>Lower Court and Trial Judge(s) in form indicated in the margin: |
| APPEAL from the Circuit Ct. of Cook County, Criminal Div. | The Honorable  Joseph Kazmierski, Judge Presiding.<br><br>Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented. |
| For APPELLANTS, John Doe, of Chicago.<br><br>For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)<br><br>Also add attorneys for third-party appellants or appellees. | Attorneys for Plaintiff-**Appellee**:   Anita Alvarez, State's Attorney<br>The People   Alan J. Spellberg, Marie Quinlivan Czech, Of Counsel<br>   County of Cook<br>   Room 309, Richard J. Daley Center<br>   Chicago, IL 60602<br><br>Attorneys for **Defendant-Appellant:**   Linda Shelton, *Pro se*<br>Linda Shelton   9905 S. Kilbourn Ave.<br>   Oak Lawn, IL 60453-3539<br>   708.952.9040 |